**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **CONTINENTAL CASUALTY COMPANY and TRANSPORTATION INSURANCE COMPANY,** | |
| **Plaintiffs,** | |
| **v.** | Civ. No. 13-4298 (KM) (JBC) |
| **J.M. HUBER CORPORATION,** | **OPINION** |
| **Defendant.** | |
| **J.M. HUBER CORPORATION,** | |
| **Counterclaimant,** | |
| **v.** | |
| **CONTINENTAL CASUALTY COMPANY and TRANSPORTATION INSURANCE COMPANY,** | |
| **Counterclaim Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiff insurance carriers, Continental Casualty Company and Transportation Insurance Company (together "CNA"), commenced this action to recover retrospective premiums allegedly owed to CNA by its insured, Defendant J.M. Huber Corporation ("JM Huber"). In response, JM Huber has asserted counterclaims for breach of contract and breach of the implied duty of good faith and fair dealing.

Now before the Court are the parties' dueling motions for summary judgment. JM Huber has moved for summary judgment as to CNA's claims (DE 221), and CNA has moved for summary judgment as to its primary breach of contract claim and JM Huber's counterclaims (DE 222). For the reasons

expressed below, CNA's motion for summary judgment is **DENIED**, and JM Huber's motion for summary judgment is **GRANTED in part and DENIED in part**.

## I.   BACKGROUND

This case arises out of an insurance coverage dispute between insurance carrier CNA and its insured, JM Huber. JM Huber, a privately-held manufacturing company, from 1969 to 2003 purchased retrospectively-rated workers' compensation and general liability insurance policies from CNA. I will briefly explain how retrospectively-rated insurance policies operate before setting out the undisputed facts of record and procedural history.

### A. Retrospective Insurance Policies

Typical insurance policies are prospective—*i.e.*, an insured pays an upfront premium to its insurance carrier for coverage of losses that may happen later. Retrospective insurance policies, however, allow for insurers to obtain additional premium payments after coverage has commenced, based on the history of claims for the relevant coverage period. These retrospective premiums are typically subject to certain negotiated price limitations and maximums. *See Liberty Mutual Ins. Co. v. Muskin Leisure Products, Inc.*, No. 3:CV-05-0253, 2007 WL 2407302, at * 1 (M.D. Pa. Aug. 21, 2007) ("The basic premise of a retrospective premium policy is that an insured's premium is calculated after coverage is completed using actual claim information."). Retrospective policies are often renewed, so that premiums can be generated and charged for many years after the expiration of a policy's coverage dates. Such policies are commonly, though not exclusively, employed for workers' compensation claims under which claimants receive lifetime benefits; latent disease claims (e.g., asbestos-related bodily injury claims) that manifest years after policy expiration; and environmental pollution claims, which likewise may emerge years after the coverage period. As the parties explain, this method of funding insurance costs also appeals to companies that need to have insurance in place for statutory, regulatory, or business reasons, but who have

confidence in their ability to limit the frequency and severity of their claims, and a desire to spread the cost of insuring their liabilities over many years. (Pl. St. ¶¶ 4-5; Def. Resp. ¶¶ 4-5.)

Here is a brief illustration of a typical retrospective insurance scheme: Company X purchases a general liability policy from Insurance Company Y that covers all asbestos bodily injury claims that occurred in the year 1985. The parties, rather than agreeing to a prospective premium that, for example, costs $100,000 and will cover all such future claims, instead agree to an upfront payment of $20,000, but the insured agrees to pay additional premiums on a retrospective basis, subject to an agreed-upon maximum of $200,000. The asbestos bodily injury claims made against Company X for injury sustained in 1985 continue to be filed in subsequent years. Insurance Company Y therefore collects additional premiums from Company X in subsequent years, without objection, on a retrospective basis. Once Company X pays off the entirety of the $200,000 premium for indemnification on 1985 asbestos claims filed against it. After that point, Insurance Company Y remains obligated to indemnify Company X as to 1985-based claims but can no longer collect additional premiums on this "closed" policy.

### B. Facts[1]

#### 1. History of CNA and JM Huber's Business Relationship

CNA began insuring JM Huber for its workers' compensation, auto, and general liabilities in 1969, and did so continuously until 2003. (Pl. St. ¶ 3;

---

[1] Certain citations to record are abbreviated as follows:

"DE" = Docket entry number in this case

"Counterclaims" = Defendant J.M. Huber Corporation's Answer to Second Amended Complaint, Separate Defenses, First Amended Counterclaims, Jury Demand and Certification of Service (DE 38)

"JM Huber Mot." = Defendant/Counterclaim-Plaintiff J.M. Huber Corporation's Memorandum of Law in Support of its Motions for Summary Judgment (DE 221-1)

"Def. St." = Defendant/Counterclaim Plaintiff J.M. Huber Corporation's Statement of Undisputed Material Facts in Support of its Motions for Summary Judgment (DE 221-2)

"Ladd Cert." = Certification of Thomas L. Ladd in Opposition to Plaintiffs Continental Casualty Company and Transportation Insurance Company's Motion for Summary Judgment (DE 221-3)

"Pl. St." = Plaintiffs Continental Casualty Company and Transportation Insurance Company's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment (DE 222-1)

"CNA Mot." = Plaintiffs Continental Casualty Company and Transportation Insurance Company's Memorandum of Law in Support of their Motion for Summary Judgment (DE 222-2)

"Thomas Aff." = Affidavit of Samuel L. Thomas, Esq. in Support of Plaintiffs' Motion for Summary Judgment (DE 222-3)

"Gianakas Aff." = Affidavit of Connie Gianakas in Support of Plaintiffs' Motion for Summary Judgment (DE 222-23)

"JM Huber Opp." = Defendant/Counterclaim-Plaintiff J.M. Huber Corporation's Memorandum of Law in Opposition to Continental Casualty Company and Transportation Insurance Company's Motion for Summary Judgment (DE 227)

"Def. Resp." = Defendant/Counterclaim-Plaintiff J.M. Huber Corporation's Statement in Opposition to Plaintiffs Continental Casualty Company and Transportation Insuance Company's Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment (DE 227-2)

"Ladd Supp. Cert." = Supplemental Certification of Thomas L. Ladd in Opposition to Plaintiffs Continental Casualty Company and Transportation Insurance Company's Motion for Summary Judgment (DE 227-3)

"CNA Opp." = Plaintiffs Continental Casualty Company and Transportation Insurance Company's Memorandum of Law in Opposition to Defendant J.M. Huber Corporation's Motion for Summary Judgment (DE 228)

"Pl. Resp." = Plaintiffs Continental Casualty Company and Transportation Insuance Company's Response and Counterstatement of Undisputed Material Facts to Defendant J.M. Huber Corporation's Statement of Undisputed Material Facts (DE 228-1)

"JM Huber Reply" = Defendant/Counterclaim-Plaintiff J.M. Huber Corporation's Reply Memorandum of Law in Further Support of its Motions for Summary Judgment (DE 229)

"CNA Reply" = Plaintiffs Continental Casualty Company and Transportation Insurance Company's Memorandum of Law in Further Support of its Motion for Summary Judgment (DE 230)

Def. St. ¶ 4.) In total, CNA issued to JM Huber at least 24 general liability policies (Def. St. ¶ 5; Pl. Resp. ¶ 5) and a comparable number of workers' compensation policies (Pl. St. ¶ 17, Pl. Resp. ¶ 17).[2] For policy periods from August 15, 1988 on, the policies contained an "Absolute Asbestos Exclusion," barring coverage for asbestos-related bodily injury claims. (Def. St. ¶ 7; Pl. Resp. ¶ 7.)

The policies that JM Huber purchased from CNA all contain retrospective payment provisions. (Def. St. ¶¶ 2-3; Pl. Resp. ¶¶ 2-3.) Here is the typical language that governs calculation, billing, and payment of premiums under the policies JM Huber purchased from CNA:

> Adjusted Premium.  Six months after the termination of the policies, or as soon thereafter as practicable, the company shall make an initial computation of the adjusted premium, using the incurred losses valued as of the date of the computation.
>
> Another computation of the adjusted premium shall be made as soon as practicable after eighteen months following the termination of the policies, using incurred losses valued as of the date of computation. Such computation of the adjusted premium for the period the policies have been in force shall be final if all claims have been closed or it is apparent that the adjusted premium will exceed the maximum adjusted premium.
>
> If such computation is not final, additional computations shall be made at twelve month intervals until such time as all claims have been closed or until the company and the insured agree that a computation shall be final. If, after the final computation has been

---

"Cappello Aff." = Affidavit of Louis Cappello in Further Support of J.M. Huber Corporation's Motions for Summary Judgment (DE 229-2)

"Joint Status Letter" = Joint Letter to the Court from Plaintiffs and Defendant, dated July 21, 2022 (DE 234)

[2]     CNA lists 25 separate workers' compensation policies covering the period between August 15, 1977 and August 15, 1993. (Def. St. at ¶ 17.) CNA does not appear to have identified any additional workers' compensation policies covering the period between August 15, 1993 and August 15, 2003.

> made, the cost of incurred losses changes, the company
> may make such additional computations as it deems
> necessary to accurately determine the adjusted
> premium.

(Ladd Supp. Cert. Ex. 5 at CNA0015887; *see also* JM Huber Opp. at 9 (noting that this language is representative of the language contained in all the policies at issue).)

This language differs, although not materially, from the language set forth in Endorsement SR-1 of CNA insurance policy number CCP0007424933, which provided general liability insurance coverage to JM Huber between August 15, 1972 and August 15, 1975 (the "1972-75 Policy"). Endorsement SR-1 reads, in part, as follows:

> [C]omputation of the retrospective premium for the
> three year period shall be final if (1) all claims have been
> closed or it is apparent that the retrospective premium
> will exceed the maximum retrospective premium. and
> (2) within ninety days from approval of such
> computation by the organization having jurisdiction,
> the company, with the agreement of the insured,
> requests of such organization that the computation be
> final.
>
> If such computation is not final, a further computation
> of the retrospective premium, based upon incurred
> losses valued as of a date eighteen months after
> termination of the policies, shall be made by the
> company as soon as practicable after such valuation
> date. Such further computation shall be final unless,
> within ninety days from approval of such computation
> by the organization having jurisdiction, the company or
> the named insured requests of such organization that a
> further computation be authorized. Any subsequent
> computations, to be made only at intervals of twelve
> months, shall each be subject to a similar procedure.

(Ladd Cert. Ex. 24 at CNA0011596; *see also* Def. St. ¶ 19; Pl. Resp. ¶19.)

Over the course of CNA and JM Huber's decades-long business relationship, disputes arose from time to time regarding CNA's coverage obligations under certain of the policies it issued to JM Huber between 1969

and 2003. For example, CNA and JM Huber entered into settlement agreements on December 30, 1993, August 13, 1998, and July 22, 2015, that resolved coverage disputes for certain environmental claims associated with JM Huber sites. (*See* Pl. St. ¶ 68; Def. Resp. ¶ 68.)

### 2. 1998 Arrangement for Billing Asbestos Claims

Around 1998, JM Huber started to be named as a premises defendant in lawsuits based on the alleged presence of asbestos at certain of its facilities. (Pl. St. ¶¶ 23-24; Def. Resp. ¶ 23-24.) JM Huber and CNA engaged in several discussions about the impact of these lawsuits on JM Huber's retrospective premium obligations. (*See* Ladd Cert. Ex. 6 (CNA file activity report detailing negotiations between JM Huber and CNA).) During this time, JM Huber informed CNA that it wished to handle and pay the asbestos claims itself, and that it did not want CNA to be involved in the defense of these claims. (Pl. St. ¶ 31; Def. Resp. ¶ 31. At oral argument, it was stated that JM Huber would thereby avoid certain tax and other surcharges.) On October 19, 1998, James Nagy (then CNA's national account representative for JM Huber), and Lou Capello (then JM Huber's risk manager) discussed these new asbestos claims and how the parties would proceed with billing, given that JM Huber would now be managing its own defense. Following this conversation, Nagy sent a letter (the "Nagy-Cappello Letter") confirming the parties' billing arrangement with respect to the asbestos claims:[3]

> Dear Mr. Cappello:
>
> This is to confirm our telephone conversation today, regarding the pending asbestos litigation JM Huber Corporation is involved.
>
> As I explained, I inherited your account from Mr. Norman Micklin who has recently retired. All the files were closed. Upon reviewing the files notes and a

---

[3]  JM Huber contends that the 1972-1975 policy was no longer subject to retrospective billing because its maximum retrospective premium had been reached, making it a "closed" policy. (Def. St. ¶ 27.) CNA disputes that this policy was closed. (Pl. Resp. ¶ 27.)

> discussion with Mr. Micklin I found out that he was requested by our National Account representative and yourself to close all claim files and not to be involved in that litigation any longer.
>
> . . . . .
>
> Mr. Micklin had confirmed coverage for asbestos related claims for 12 policy years up to 8-15-1988, all subsequent policies contained an "Absolute Asbestos Exclusion" and coverage did not apply.
>
> During our conversation today, you have confirmed, that all CNA policies contained large deductibles and/or Retro arrangement. This meant, that JM Huber was to pay the legal fees and indemnity. You did not want me to reopen a claim file for every policy year, and agreed, that I am to open 1 file with a minimal $1,000 reserve. I have picked the **1972-75 policy** and I will hold this file open for monitoring purposes. If at any time you wish CNA to be actively involved in the litigation, please let us know, files for the additional years can always be reopened. The purpose to reopen a claim file for each policy year is to allocate costs and possible indemnity payments evenly between the years of exposure.
>
> Please direct all future correspondence on asbestos matters to my attention and refer to the above claim number.
>
> Should there be any misunderstanding, or wish to discuss the contents of this letter, please do not hesitate to contact me at any time.

(Pl. St. ¶ 34 (emphasis added); Def. Resp. ¶ 34.)

On November 19, 1998, Nagy and Cappello had another telephone conversation regarding the handling of the asbestos claims. On January 11, 1999, Nagy memorialized this conversation in a follow-up letter to Cappello that stated:

> Dear Mr. Cappello:
>
> This is follow up on my October 19, 1998 letter to you and our subsequent telephone conversation on November 19, 1998. The subject of our discussion was the further handling of asbestos cases.

> As you know, I inherited this account upon Mr. Micklin['s] retirement Mr. Micklin closed all claims files, because it was his understanding that you wanted to control defense, and having Retro policies and still a large amount in self insured retention is left, you did not want to deal with the Retro expenses. During our November 19, 1998, you indicated that you might want to change the present system, and you were going to let me know of your decision.
>
> Recently I have been receiving regular status reports from counsel on the Victor Branch matter, and also received a bill for his services. I have not paid this bill, I will wait for your instruction.
>
> Please be advised that I have no problem with taking control of this litigation, and I will do as you wish me to proceed. Should you decide that CNA handle all your asbestos claims, I would have to open new files for all years of coverage with CNA with at least a $1,000 reserve for each file.
>
> I will await your instruction. Should you wish to discuss this matter, please call me at any time.

(Pl. St. ¶ 39; Def. Resp. ¶ 39.)

The updated billing arrangement appears to have been the subject of internal discussion among CNA personnel on several occasions over the next several years. (*See* Cappello Aff. Ex. A (August 21, 2000 CNA internal file report entered by James Nagy in which he notes that "I have agreed to continue under the one open file, but I did tell Mr. Cappello that if there are many new claims we may have to change the system."); Cappello Aff. Ex. D (September 28, 2005 CNA internal file report discussing JM Huber policies); Cappello Aff. Ex. D (April 3, 2007 CNA internal file report noting that "for asbestos, because of the retro issues, we only have one policy set up").) Meanwhile, JM Huber experienced an uptick in new asbestos-related claims after 2000. Though the parties disagree as to the exact number, the record suggests there were over 2,900 asbestos-related claims filed against JM Huber in 2001 and 2002 alone. (Thomas Aff. Ex. S at CNA0030325.) Nevertheless, the record reflects that

9

neither of the parties departed from the billing arrangement set forth in the 1998 Nagy-Cappello Letter until 2012.

### 3. The Current Dispute

On September 1, 2010, CNA transferred responsibility for management of JM Huber's asbestos-related claims to a third-party claims administrator, Resolute Management Midwest, Inc., n/k/a Resolute Management, Inc. ("Resolute"). (Pl. St. ¶ 49; Def. Resp. ¶ 49.) In May 2011, Resolute identified the lack of "trailer files"[4] associated with the 1972-1975 Policy and initiated the process of establishing those files and allocating payments for JM Huber's asbestos claims to the policy years that they triggered. (Pl. St. ¶¶ 50-51; Def. Resp. ¶¶ 50-51.) On August 4, 2011, Cappello reached out to Resolute seeking an explanation as to why these 19 new claim files were created and alerting Resolute to the master claim file, which had been "set up some time ago for all asbestos claims" and "tracks all of the payments made on asbestos files." (Pl. St. ¶ 54; Def. Resp. ¶54.)

On March 12, 2012, CNA submitted an invoice to JM Huber seeking payment in the amount of $33,629 for retrospective premiums generated by Resolute's initial allocation of CNA's asbestos-related indemnification payments across the policies that CNA contends were triggered by these payments. (*See* Pl. St. ¶ 55; Def. Resp. ¶ 55.) The invoice indicates that these payments are derived from 13 separate "programs" associated with the years 1978 and 1981-1992. (Thomas Aff. Ex. R.) On March 19, 2012, Cappello sent a series of questions regarding the invoice to Cynthia Garnsey, CNA's Collection Coordinator. Cappello asked Garnsey to provide the basis for CNA's creating new trailer files, and questioned why "all of a sudden" claims were being opened for individual policy years. (Pl. St. ¶ 56; Def. Resp. ¶ 56.) On April 12,

---

[4]     The term "trailer files" refers to individual files for each year of coverage to which claims are allocated in order to generate retrospective premiums under the policy associated with the year of alleged injury.

2012, Garnsey provided the following response to Cappello's inquiry regarding the creation of the trailer files:

> The JM Huber asbestos claims have been handled under multiple policies issued to JM Huber ending in 1988. It has always been CNA's standard practice and is currently Resolute Management's standard practice to open a master file and a trailer file for any policies under which CNA undertakes the indemnity and/or defense of a loss. The master claim file 02-103942 is used as the payment file. In May 2011, the lack of trailer files was identified by Resolute Management and the process of establishing those files began.

(Pl. St. ¶ 57; Def. Resp. ¶ 57.) On May 3, 2012, CNA and Resolute representatives attended a meeting to discuss the invoice. (Pl. St. ¶ 58; Def. Resp. ¶ 58.) On August 16, 2012, Connie Gianakas of Resolute followed up with an email to Cappello providing further explanation:

> [A]t CNA and at Resolute we process claims payments from a master file and periodically transfer the payments from the master file to claims files established on additional policies issue to the Insured that apply to the claim. The 1972 policy year and other JM Huber' policies that were issued without asbestos exclusions are responding to the asbestos claims filed against JM Huber. It is our understanding that JM Huber is seeking coverage for its asbestos claims under all applicable policies. If that understanding is incorrect, please advise.
>
> Payments and reallocations of those payments are consistent with the understanding that JM Huber is seeking coverage under all applicable policies and that CNA is providing a defense and paying indemnity, where appropriate, on behalf of JM Huber is in further furtherance of CNA's policy obligations.
>
> I am not familiar with JM Huber's retrospective premium program and therefore cannot comment on your references to closed years.  If that requires further discussion, I direct you to CNA. Issues related to billings and retrospective premiums are not managed by the Resolute claims handlers.  From the claims perspective, however, we are not aware of any exhaustion or erosion of JM Huber's primary policy limits. If you are

> commenting that the 1972 policy and/or any other JM
> Huber primary policy may be exhausted (therefore,
> "closed") please contact me immediately so we can
> discuss your understanding.

(Pl. St. ¶ 57; Def. Resp. ¶ 57; Gianakas Aff. Ex. N.)

On March 5, 2013, CNA sent JM Huber a second invoice, seeking payment in the amount of $737,116 for additional retrospective premiums allocated across 14 separate "programs" for the years 1975, 1978, and 1981-1992. (Ladd Cert. Ex. 21.) JM Huber once again objected. (Ladd Cert. Ex. 22 (April 5, 2013 email from Lou Cappello to Connie Gianakas of Resolute objecting to CNA/Resolute's "reallocation" billing).) On October 16, 2014, CNA sent JM Huber a third invoice of the same kind, seeking payment in the amount of $741,408 for additional retrospective premiums allocated across 14 separate "programs" for the years 1978 and 1981-1993. (Def. St. ¶ 51; Pl. Resp. ¶ 51; Ladd Cert. Ex. 23.) This third invoice was billed just over a year after CNA initiated the present suit against JM Huber (July 12, 2013).[5]

In its papers, CNA claims that JM Huber currently owes $1,860,750 in retrospective premiums, consisting of $1,125,560 in asbestos-related premiums, $551,101 in pollution premiums, and $184,089 in workers'

---

[5]     These amounts were subject to further adjustment as was apparently reflected in further billing that occurred after CNA filed its Second Amended Complaint. (Pl. St. ¶ 83; Def. Resp. ¶ 83.) The parties agree that the specific CNA-JM Huber policies currently at issue include 19 general liability policies (bearing policy numbers CCP 0004141407; CCP 0007424933; CCP 9002477640; CCP 5004754741; CCP 2007437094; CCP 1001359286; CCP 5001700411; CCP 7001701315; CCP 3001702791; CCP 4001704130; CCP8001704142; CCP 2001597596; CCP 5001604858; GL 4001604884; CCP 9007411694; CCP 6007413410; CCP 8007415981; GL 4007417989; and GL 7002515479), and 25 workers' compensation policies (bearing policy numbers WC1002535218; WC3002535220; WC5003452464; WC7003452463; WC6006874012; WC8006874011; WC7006860179; WC9006860181; WC2001700399; WC4001700403; WC7001700407; WC0001701305; WC5001701302; WC7001701301; WC1001702775; WC2001702783; WC0001704138; WC3001704122; WC5001704118; WC4001597595; WC7001604857; WC4007411691; WC8007413406; WC8007415978; WC1007417985; and WC0002515477). (Pl. St. ¶ 17; Def. Resp. ¶ 17.)

compensation premiums.[6] (Pl. St. ¶ 83; Def. Resp. ¶ 83.) These figures, according to CNA, continue to increase. At oral argument, counsel for CNA noted that CNA has continued to provide coverage to JM Huber throughout the pendency of this litigation, but JM Huber has refused to make any premium payments on invoices it received from CNA since March 12, 2012.

### C. Procedural History

CNA initiated this action on July 12, 2013. (DE 1.) On October 8, 2014, CNA filed its operative pleading, its Second Amended Complaint, in which CNA asserts claims against JM Huber for 1) breach of contract, 2) unjust enrichment, and 3) account stated. (DE 37.) On October 27, 2014, JM Huber answered CNA's Second Amended Complaint and asserted counterclaims against CNA for 1) breach of contract and 2) breach of the implied duty of good faith and fair dealing. (DE 38.)

On March 18, 2022, the parties each filed summary judgment motions. (DE 221; DE 222.) CNA, by way of its motion, requests that the Court: 1) enter judgment in its favor and against JM Huber in the amount of $1,860,750, and 2) dismiss JM Huber's counterclaims against CNA for breach of contract and breach of the duty of good faith and fair dealing. (DE 222-79.) JM Huber, by

---

[6] Although the primary narrative of this dispute pertains to the retrospective premiums JM Huber allegedly owes CNA for asbestos-related claims, CNA alleges that in ceasing to pay its bills since 2012, JM Huber has also failed to pay retrospective premiums for certain pollution-related claims, as well as for certain workers' compensation claims. CNA asserts that JM Huber has not disputed that it owes $184,089 for workers' compensation claims, and that JM Huber's only arguments disputing what it allegedly owes for pollution claims are now moot. (CNA Mot. at 2, 22.) JM Huber has responded that it does, in fact, dispute what it was billed for the pollution claims, stating that CNA has not produced evidence to substantiate the amount it alleges JM Huber owes, and further arguing that a significant number of the claims CNA included in its calculations were untimely and improper in any event. (JM Huber Opp. at 20-23.) With respect to the workers' compensation claims, JM Huber states that it is unable to confirm the accuracy of the amounts CNA alleges JM Huber owes because its communication with CNA on the matter ceased when CNA filed suit, and so it "puts Plaintiffs to their proofs" regarding these losses as well. (JM Huber Reply at 7 n.3; Joint Status Letter at 3.)

way of its motion, requests that the Court find that: 1) CNA has breached the terms of the retrospective premium insurance contracts, and thus, cannot recover retrospective premiums from JM Huber for asbestos-related and environmental-related losses that were not timely billed; 2) CNA's attempts to collect for any retrospective premiums that would have become due prior to July 12, 2007 are time-barred under New Jersey's six-year statute of limitations to bring a breach of contract action (citing N.J.S.A. § 2A:14-1); 3) in 1998, CNA and JM Huber entered into a binding and enforceable contract governing the handling and billing of asbestos-related losses, and because CNA is in breach of that agreement, CNA is now barred from recovering retrospective premiums from JM Huber for asbestos-related losses; 4) CNA's claim for unjust enrichment fails as a matter of law; 5) CNA's claim for account stated fails as a matter of law; 6) CNA's claims are barred by the doctrine of waiver; and 7) CNA's claims are barred by the doctrine of estoppel. (DE 221-6.)

On May 13, 2022, the parties filed briefs in opposition to one another's summary judgment motions. (DE 227; DE 228.) On June 3, 2022, the parties filed reply briefs in support of their respective motions. (DE 229; DE 230.) On November 29, 2022, the Court heard oral argument on the two motions. The parties' summary judgment motions are fully briefed and ripe for decision.

## II.   LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude the Court from granting a motion for summary judgment. *See id.*

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). "A party asserting that a fact [is not] genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents . . ., affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F.Supp.2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)). "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250-51.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F. 3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). In that respect, the Court's role in deciding a motion for summary judgment is simply "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

When, as here, the parties file cross-motions for summary judgment, the governing standard "does not change." *Auto-Owners Ins. Co. v. Stevens & Ricci,*

*Inc.*, 835 F.3d 388, 401 (3d Cir. 2016) (citing *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). The court must consider the motions independently, in accordance with the principles outlined above. *Goldwell of N.J., Inc. v. KPSS, Inc.*, 622 F. Supp. 2d 168, 184 (D.N.J. 2009); *Williams v. Philadelphia Housing Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir. 1994). That one of the cross-motions is denied does not imply that the other must be granted. For each motion, "the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made" but does not "weigh the evidence or make credibility determinations" because "these tasks are left for the fact-finder." *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (internal quotation and citations omitted).

## III.   DISCUSSION

### A. Breach of Contract Claims

There are several genuine, disputed issues of material fact that bear on both parties' breach of contract claims: 1) whether CNA intended to enter into a binding agreement regarding CNA's handling of JM Huber's asbestos claims; 2) whether the parties' conduct establishes that CNA waived its right to payment for asbestos losses; 3) whether JM Huber detrimentally relied on the fact that CNA did not submit invoices for any asbestos losses for more than ten years; and 4) how much JM Huber owes CNA for pollution and workers' compensation claims. Therefore, summary judgment is inappropriate for either party on CNA's breach of contract claim or on JM Huber's breach of contract counterclaim.[7]

---

[7] As a threshold issue, JM Huber argues that CNA's claims for retrospective premiums from the years 2007 or earlier are barred by New Jersey's six-year statute of limitations for breach of contract under N.J. Stat. Ann. § 2A:14-1. Curiously, JM Huber contends that the insurance policies at issue function as installment contracts simply because they were renewed annually and billing was purportedly required to occur at agreed-upon periodic intervals. (JM Huber Mot. at 21-24.) According to JM Huber, it must follow that CNA is barred from recovering premiums that it billed, or could have billed, more than six years prior to when CNA filed suit. (*Id.*) JM Huber

To establish a breach of contract claim, a claimant must show (1) "that the parties entered into a valid contract"; (2) "that the defendant failed to perform [its] obligations under the contract"; and (3) "that the plaintiff sustained damages as a result." *Murphy v. Implicito*, 392 N.J.Super. 245, 920 A.2d 678, 689 (App. Div. 2007).[8] "A contract exists when there was a meeting

_____

confuses when CNA had a right to payment with when a cause of action accrued for breach. The statute of limitations for a "contractual claim or liability" is "six years next after the cause of any such action shall have accrued." *See* N.J.S.A. §2A:14-1(a). "The traditional rule followed by New Jersey courts is that a cause of action accrues on the date when 'the right to institute and maintain a suit,' first arises." *See Peck v. Donovan*, 565 Fed. Appx. 66, 69 (3d Cir. 2012). "Generally under New Jersey law, a cause of action arising from a breach of contract accrues when the defendant breached the contract." *Id.* Here, CNA alleges JM Huber committed a breach when it refused to pay the debt set forth in the April 12, 2012 invoice it received from CNA. Therefore, CNA's right to file the present suit arose on April 12, 2012 and CNA did so well within the six-year limitation period by filing suit on July 12, 2013. JM Huber's position implies that a cause of action can accrue before an alleged breach, which is inconsistent with the plain text of the statute. And even if JM Huber's position was correct, it would not warrant an award of summary judgment because factual issues would remain as to whether the policy terms were modified by a subsequent agreement, which could have arguably altered the timing for when a cause of action arose.

[8]     "[I]n a diversity action, a district court must apply the choice of law rules of the forum state to determine what law will govern the substantive issues of a case." *Warriner v. Stanton*, 475 F.3d 497, 499–500 (3d Cir.2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). New Jersey uses the most-significant-relationship test, which consists of two prongs. *Maniscalco v. Brother Int'l Corp. (USA)*, 793 F.Supp.2d 696, 704 (D.N.J.2011), *aff'd*, 709 F.3d 202 (3d Cir.2013). First, the court must determine whether a conflict actually exists between the potentially applicable laws. *P.V. v. Camp Jaycee*, 197 N.J. 132, 143 (2008) ("Procedurally, the first step is to determine whether an actual conflict exists. That is done by examining the substance of the potentially applicable laws to determine whether there is a distinction between them.") (internal quotations omitted). "[I]f no conflict exists, the law of the forum state applies." *Snyder v. Farnam Companies, Inc.*, 792 F.Supp.2d 712, 717 (D.N.J. 2011) (quoting *P.V.*, 197 N.J. at 143). If a conflict exists, the court then moves to the second prong: it must determine "which state has the 'most significant relationship' to the claim at issue by weighing the factors" in the applicable section of the Restatement (Second) of Conflict of Laws. *Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 134 N.J. 96, 102 (1993). The parties seem to agree that New Jersey law applies in this diversity action. At any rate, they point to no aspect in which

of the minds, there was an offer and acceptance, there was consideration, and there was certainty in the terms of the agreement." *See Allen-White v. Bloomingdale's, Inc.*, 225 F. Supp. 3d 254, 258 (D.N.J. 2016). A meeting of the minds "occurs when there has been a common understanding and mutual assent of all the terms of a contract." *See Knight v. New Eng. Mut. Life Ins. Co.*, 220 N.J. Super. 560 (App. Div. 1987).

JM Huber argues that CNA cannot recover retrospective premiums for claims it failed to timely bill, in breach of Endorsement SR-1 of the 1972-75 Policy. (JM Huber Mot. at 16-21.) JM Huber further argues that even if this was not a material obligation, the parties entered into an enforceable contract—as memorialized by the 1988 Nagy-Cappello Letter and inferable from the parties' conduct—under which CNA was obligated to pay JM Huber's asbestos losses in exchange for JM Huber managing its own defense of the asbestos-related claims. (JM Huber Mot. at 24-26.) JM Huber also asserts that the parties' course of conduct establishes that CNA waived its right to payment for asbestos losses, and that JM Huber's reliance on CNA not submitting any invoices for asbestos-related losses for over ten years warrants estoppel. (JM Huber Mot. at 31-33.)

CNA argues that Endorsement SR-1 does not determine the timing of billing for retrospective premiums, and that even if it did, JM Huber waived any rights it had to any manner of allocation and billing required under Endorsement SR-1 when it asked CNA to close all trailer files while JM Huber self-funded its defense.[9] (CNA Mot. at 6-8.) CNA further argues that the parties never agreed to modify the 1972-75 Policy, and that neither the Nagy-Cappello

---

the application of non-forum law would change the result. Having been directed to no applicable conflict, I apply general principles of New Jersey contract law.

[9]    CNA argues yet another alternative, that even if Endorsement SR-1 did confer some obligation on CNA to allocate and bill for asbestos losses in a certain manner, and even if JM Huber did not waive entitlement to the same, failing to timely and annually bill JM Huber for asbestos claims would not constitute a material breach. (CNA Mot. at 8-9.)

Letter nor the parties' conduct reflects any enforceable agreement with respect to the asbestos claims. (CNA Mot. at 9-14.) CNA also rejects JM Huber's waiver and estoppel arguments. (CNA Opp. at 14-16.)

The factual issues that remain prevent either party from satisfying the elements of its breach of contract claim. At this stage, neither party has met its burden of proof that a valid contract exists (more specifically, *what* agreement controls); that its opponent's conduct constituted a breach of the alleged operative agreement; or that the claimant was injured as a result. Because the parties have produced evidence showing that the underlying factual issues are in dispute, summary judgment is inappropriate for either party on CNA's breach of contract claim or JM Huber's breach of contract counterclaim.

### 1. *Did CNA intend to enter into a binding agreement modifying the policy terms?*

The first issue of material fact is whether CNA intended to enter into a binding agreement under which it was obligated to pay JM Huber's asbestos losses in exchange for JM Huber managing its own defense of the asbestos-related claims.[10]

According to JM Huber, the Nagy-Capello Letter memorializes this binding agreement and was the result of substantial negotiation between the parties. (JM Huber Mot. at 8-10.) JM Huber points to internal files produced by CNA as evidence that CNA intended to enter that agreement. One such file shows that one year into their purported agreement, CNA was regularly paying JM Huber's defense invoices for asbestos claims, while acknowledging that JM Huber was controlling the litigation. (*Id.* at 10 (citing Ladd Cert. Ex. 6).) JM Huber adds that CNA's intent to be bound can be inferred from subsequent

---

[10]   At oral argument, the parties confirmed their shared understanding that the arrangement memorialized by the Nagy-Cappello Letter initially called for JM Huber not only to manage its defense of asbestos-related claims, but also to "self-fund" its defense. Of course, this is not how the story played out, as JM Huber eventually began to submit bills to CNA for costs incurred in defending asbestos-related claims, and CNA began to pay those bills, leaving both sides with some explaining to do.

internal files which show that over the course of the next several years, CNA reviewed the arrangement set forth in the Nagy-Cappello Letter on multiple occasions, discussed whether to seek to amend it, and each time decided to maintain the status quo. (*Id.* at 11-12 (citing Ladd Cert. Exs. 11, 12, 13).)

CNA presents a starkly different version of the facts. According to CNA, the Nagy-Cappello Letter represents nothing more than a request by JM Huber for an "administrative accommodation" to monitor the asbestos claims in a single file and defer allocation of the losses while JM Huber self-funded its defense. (CNA Mot. at 8, 11.) Moreover, CNA asserts that the parties' course of performance shows CNA did not intend to modify the terms of the existing policies. To support its position, CNA argues: 1) the Nagy-Cappello Letter reserved CNA's rights to "reopen a claim file for each policy year [] to allocate legal costs and possible indemnity payments evenly between the years of exposure";[11] 2) Nagy sent a subsequent letter, confirming that "JM Huber prefers to handle the defense of these asbestos cases itself, and did not want CNA to be involved"; and 3) Nagy sent yet another letter to JM Huber, stating that should JM Huber decide to have CNA handle all the asbestos claims, "I would have to open new files for all years of coverage with CNA with at least a $1,000 reserve for each file." (CNA Mot. at 14.)[12]

Whether CNA intended to enter into the alleged agreement with JM Huber regarding the handling of asbestos claims is a determination the trier of fact must make based on the evidence presented, including the Nagy-Cappello Letter and the parties' conduct between 1998 and 2012. Prevailing on that

---

[11]    JM Huber takes the view that, contrary to a reservation of rights, this language signifies a unilateral option that could be, but never was, exercised only by JM Huber. (JM Huber Opp. at 15 n.7.)

[12]    At oral argument, counsel for CNA conceded that, by virtue of what CNA views as an accommodation set forth in the Nagy-Cappello, CNA reduced its obligations under the parties' existing agreements, but counsel reasserted CNA's position that, given the absence of valid consideration, the letter did not memorialize a new enforceable agreement between the parties or an enforceable modification to their existing agreements.

factual determination is one important precondition to either party's succeeding on its breach of contract claim. Put simply, if CNA did intend to enter into the agreement, then CNA's breach of contract claim is misplaced because it is based on a prior agreement that had since been modified. On the other hand, if CNA did not intend to modify the policy terms, then there was no meeting of the minds to establish a new binding agreement. And if that was the case, then JM Huber's breach of contract claim hinges on a secondary slate of factual questions, such as whether CNA's alleged breach of Endorsement SR-1 was material, whether JM Huber's request for an "administrative accommodation" to defer allocation of asbestos claims constituted a waiver of its right to timely annual billing, and whether CNA reserved its right to open trailer files and allocate JM Huber's asbestos losses accordingly.[13]

Whether CNA intended to agree to a modification of the policy terms is a genuine issue of material fact that remains in dispute.

### 2. *Did CNA waive its right to payment for asbestos losses?*

The second issue of material fact is whether CNA waived its right to payment for asbestos losses.

---

[13]     JM Huber relies almost exclusively on *Transp. Ins. Co. v. Busy Beaver Bldg. Ctrs.*, 969 F.Supp.2d 875 (S.D. Ohio 2014) ("*Busy Beaver*") to support its argument that CNA materially breached Endorsement SR-1 by failing to timely bill JM Huber for its asbestos losses. (JM Huber Mot. at 20-21.) JM Huber argues that because the Southern District of Ohio granted summary judgment to the insured in an action that involved the same insurer, same attorneys, same policy language, and the untimely billing of retrospective premiums, I should follow suit and grant summary judgment to the insured here as well. Setting aside the fact that *Busy Beaver* is not binding precedent, the case is distinguishable from the present action. Here, for example, it is *JM Huber* that alleges the policy terms were modified by a subsequent binding agreement between the parties. JM Huber has thus itself introduced several of the genuine issues of material fact that prevent me from granting summary judgment to either party at this juncture. Moreover, JM Huber is not a successor entity claiming to lack any knowledge of its predecessors' arrangements. The holding of *Busy Beaver* therefore has little bearing on my decision.

"Waiver is the voluntary and intentional relinquishment of a known right." *Knorr v. Smeal*, 178 N.J. 169, 177 (2003) (citation omitted). Therefore, to prove waiver, "it must be shown that the party charged with the waiver knew of his or her legal rights and deliberately intended to relinquish them." *Shebar v. Sanyo Bus. Corp.*, 111 N.J. 276, 291 (1988). The intent to waive "need not be stated expressly, but may be spelled out from a state of facts exhibiting full knowledge of the circumstances producing a right and continuing indifference to exercise of that right." *See Univ. Spine Ctr. v. Aetna Inc.*, No. CV 17-8160, 2018 WL 1409796, at *6 (D.N.J. Mar. 20, 2018) (quoting *Merchants Indem. Corp. v. Eggleston*, 68 N.J. Super. 235, 254 (App. Div. 1961)). Waiver will often pose issues of fact. *See Shebar*, 111 N.J. at 291 (stating that questions of waiver are questions of intent, which are factual determinations).

JM Huber argues that CNA's conduct "evinces an intent to relinquish its rights to any payments to which it might otherwise have been entitled" because it could have billed JM Huber for asbestos losses for over a decade but declined to do so. (JM Huber Mot. at 31.) JM Huber cites the internal CNA files discussed *supra* as further evidence of CNA's purported waiver. (*Id.*) CNA, for its part, argues that the record shows CNA was merely accommodating its insured by deferring billing and allocation, essentially overlooking some small dollar amounts, while reserving its right to do so later. (CNA Opp. at 14-15.) Both parties conceded at oral argument that at some point, JM Huber stopped self-funding and submitted claims to CNA, which CNA paid. CNA still failed to bill JM Huber for premiums, which CNA attributed to an oversight and the departure of the person previously managing the account. Given that both parties' interpretations of the record are reasonably based on the evidence, the trier of fact must weigh the evidence and make a determination as to CNA's intent.

Whether CNA intended to waive its right to payment for JM Huber's asbestos losses is a genuine issue of material fact that remains in dispute.

### 3. *Did JM Huber detrimentally rely on CNA not submitting invoices for asbestos claims for more than a decade?*

The third genuine issue of material fact is whether JM Huber reasonably relied to its detriment on CNA's not charging retrospective premiums for asbestos-related claims for more than a decade.

JM Huber asserts that CNA's claims are barred by equitable estoppel. "Estoppel is an equitable doctrine, founded in the fundamental duty of fair dealing imposed by law." *See Knorr v. Smeal*, 178 N.J. 169, 178 (2003) (quoting *Casamasino v. City of Jersey City*, 158 N.J. 333, 354 (1999)). "The doctrine is designed to prevent injustice by not permitting a party to repudiate a course of action on which another party has relied to his detriment." *Id.* "[T]o establish equitable estoppel, plaintiff[] must show that defendant engaged in conduct, either intentionally or under circumstances that induced reliance, and that plaintiff[] acted or changed [its] position to [its] detriment." *Id* (citing *Miller v. Miller*, 97 N.J. 154, 163 (1984)).

JM Huber argues that CNA is estopped from collecting retrospective premiums for JM Huber's asbestos-related claims because JM Huber detrimentally relied on the absence of any invoices for asbestos losses for more than a decade, and that as a result, it was unable to question the accuracy of the bills at the time of the losses or shop around for more affordable insurance. (JM Huber Mot. at 32-33.) CNA contends that JM Huber's reliance was unreasonable because it could not have reasonably believed that CNA was providing coverage of thousands of asbestos claims for free. (CNA Opp. at 15-16.) CNA also asserts that JM Huber's reliance was not detrimental because it enjoyed the benefit of insurance coverage and an extended payment vacation. (*Id.* at 16.) The trier of fact must weigh the evidence and determine whether JM Huber reasonably relied on CNA's conduct and whether that reliance was to its detriment.

Whether JM Huber detrimentally relied on CNA's not submitting invoices for asbestos losses for more than a decade is a genuine issue of material fact that remains in dispute.

### 4. *What does JM Huber owe CNA for pollution and workers' compensation claims?*

The fourth genuine issue of material fact is the amount JM Huber owes CNA for pollution and workers' compensation claims.

CNA claims JM Huber currently owes $551,101 in retrospective premiums for pollution claims, and $184,089 in retrospective premiums for workers' compensation premiums. CNA asserts that JM Huber has not disputed that it owes $184,089 for workers' compensation claims, and that JM Huber's only remaining argument regarding the amount it owes for pollution claims are based on a misapplication of the statute of limitations. (CNA Mot. at 2, 22.) I have already rejected JM Huber's argument that certain pollution claims are time-barred. That aside, CNA is otherwise correct that JM Huber has not contested the amount it owes for workers' compensation claims and does not pose a live argument disputing what CNA alleges it owes for pollution claims. Nevertheless, based on the record before me, I am unable to grant CNA partial summary judgment on its breach of contract claim for the unpaid pollution and workers' compensation premiums. It is not enough for CNA to deny that JM Huber has disputed the amounts that appear on its invoices. CNA must also substantiate these amounts with evidence that shows why it is entitled to $551,101 for pollution claims and $184,089 for workers' compensation claims. At least in its briefing, it has failed to do so, though at oral argument it referred to documents in the record from which these amounts could be derived. JM Huber contends that it "cannot confirm the accuracy of the amounts allegedly owed" (Def. St. ¶¶ 79-80); the Court is unable to perform its own accounting. At any rate, the issues are so intertwined that the Court is no inclined to exercise its discretion to award relief on parts of claims.

\*   \*   \*

24

At least four issues of material fact bar an award of summary judgment to either party on CNA's breach of contract claim or on JM Huber's breach of contract counterclaim.

## B. JM Huber's Remaining Claim (Duty of Good Faith and Fair Dealing)

Genuine, disputed issues of material fact remain regarding whether CNA conduct constituted actionable bad faith, preventing me from awarding summary judgment to CNA on JM Huber's counterclaim for breach of the implied duty of good faith and fair dealing.

"Every contract in New Jersey contains an implied covenant of good faith and fair dealing." *Gotthelf v. Toyota Motor Sales, U.S.A., Inc.*, 525 Fed. App'x 94, 106 (3d Cir. 2013) (citing *Kalogeras v. 239 Broad Ave., LLC*, 202 N.J. 349, 366, 997 A.2d 943 (2010)). A breach of this implied covenant occurs if one of the parties to the contract "acts in bad faith or engages in some other form of inequitable conduct in the performances of a contractual obligation." *Black Horse Lane Assoc, L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 288 (3d Cir. 2000) (citing *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 423–24, 690 A.2d 575 (1997)). Described differently, "good faith" entails adherence to "community standards of decency, fairness[,] or reasonableness" and requires a party to refrain from "destroying or injuring the right of the other party to receive its contractual benefits." *Iliadis v. Wal–Mart Stores, Inc.*, 191 N.J. 88, 109–10, 922 A.2d 710 (2007) (citations omitted). "[A] plaintiff must also prove the defendant's bad motive or intention." *Id.* On the other hand, a party does not breach this implied covenant merely by making decisions that disadvantage the other party, nor are the parties required to behave altruistically to each other. *Fabbro v. DRX Urgent Care, LLC*, 616 Fed. App'x 485, 488 (3d Cir. 2015) (quoting *Elliott & Frantz, Inc. v. Ingersoll–Rand Co.*, 457 F.3d 312, 329 (3d Cir. 2006)).

The general implied contractual covenant of good faith has a particular application to insurance contracts:

> The good faith obligations of an insurer to its insured run deeper than those in a typical commercial contract. Unlike with a typical commercial contract, in which proof of bad motive or intention is vital to an action for breach of good faith, an insurer's breach of good faith may be found upon a showing that it has breached its fiduciary obligations, regardless of any malice or will.

*Badiali v. N .J. Mfrs. Ins. Grp.*, 220 N.J. 544, 554 (2015) (internal quotations and citations omitted). Examples of bad faith conduct by insurance companies include "refusing to pay claims without conducting a reasonable investigation based upon all available information" and "not attempting to negotiate in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." *Id.* (quoting N.J. Stat. Ann. § 17:29B–4(9)(d) and (f)) (internal quotations omitted).

The party alleging a breach of the implied covenant of good faith and fair dealing must provide sufficient evidence to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties. *Gotthelf*, 525 Fed. App'x at 106. This includes actions which have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. *Kalogeras*, 202 N.J. at 366, 997 A.2d 943. "It is not enough for [the plaintiff] to merely present evidence that [d]efendants acted in bad faith; those alleged bad-faith actions must also have denied [p]laintiff 'the benefit of the bargain originally intended by the parties.'" *Irwin Katz & Assoc, Inc. v. Concepts in Health, Inc.*, No. 13-1217, 2017 WL 593502, at * 23 (D.N.J. Feb. 14, 2017) (quoting *Gotthelf*, 525 F. App'x at 106).

Importantly, a plaintiff cannot also maintain a claim for breach of the implied covenant of good faith and fair dealing when the conduct at issue is governed by the terms of an express contract or the cause of action arises out of the same conduct underlying the alleged breach of contract. *See Wade v. Kessler Inst.*, 172 N.J. 327 (2002).

Here, JM Huber argues that CNA breached the implied covenant of good faith and fair dealing by "arbitrarily and capriciously reallocating payments under the Policies, failing to cooperate with JM Huber in its efforts to understand the basis for the retrospective premium bills issued by [CNA] and issuing retrospective premium bills for incorrect and/or unsubstantiated amounts." (Counterclaims at 16.) Two of these three allegations of bad faith—that CNA improperly reallocated payments and issued bills for incorrect and/or unsubstantiated amounts—are not cognizable as bases for a good faith and fair dealing claim because they are governed by the contract and involve the same conduct that forms the basis for JM Huber's breach of contract counterclaim. JM Huber's remaining allegation, however, that CNA failed to cooperate in resolving and explaining the issues associated with CNA's sudden change in billing practices, does give rise to a possible claim for breach of the implied covenant of good faith and fair dealing.

The question of bad faith is a question of fact, *Cedar Holdings, LLC v. Menashe*, No. 16-7152, 2017 WL 1349321, at *4 (D.N.J. Apr. 7, 2017), and here there is a dispute over that question of fact. As JM Huber interprets the facts, once CNA retained Resolute as a third-party administrator to handle JM Huber's asbestos and environmental liabilities, CNA ceased to cooperate with JM Huber after decades of successful partnership. (JM Huber Opp. at 25.) First, CNA withdrew its defense of JM Huber in a case in which it had been defending its insured for more than a decade. (*Id.*) Then, in 2012, CNA allegedly offered no meaningful answers to Mr. Cappello when he inquired about why asbestos claims were suddenly appearing on CNA's invoices after more than a decade (while CNA personnel were posing the same questions internally). (*Id.*) Following additional requests by Mr. Cappello for the rationale behind CNA "reneg[ing] on their agreement," CNA merely sent Mr. Cappello two boxes of loss data without further clarification of CNA's change in course. (*Id.*)

CNA of course offers an alternative interpretation of the facts. According to CNA, despite not have any such duty or obligation, it "went to great lengths

to answer all of JM Huber's questions on the allocation and billing of retrospective premiums." (CNA Reply at 7-8.) First, CNA sent JM Huber a letter on April 12, 2012 providing substantive responses to JM Huber's questions regarding why it opened trailer files for the asbestos-related claims, the individual asbestos plaintiffs included in the claim files established for each triggered policy, and the timing of the allocation from the master file to the trailer files. (*Id.*) Second, CNA and Resolute held a meeting with Mr. Cappello on May 3, 2012 at which CNA and Resolute provided him with an explanation of, among other things, the claim file structure and any reallocation. Third, Resolute emailed Mr. Cappello on August 16, 2012 and explained why CNA and Resolute "process claims payments from a master file and periodically transfer the payments from the master file to claims files established on additional policies issued to the Insured that apply to the claims ... consistent with the understanding that JM Defendant is seeking coverage under all applicable policies." (*Id.*) Finally, Resolute sent JM Huber two boxes of "documents supporting the indemnity payments to individual claimants and the overall defense costs allocated to the Policies, including settlement agreements, defense counsel invoice, etc." (*Id.*)

Genuine issues of fact remain as to whether CNA acted in bad faith in the performance of its contractual obligations. Viewing the facts in the light most favorable to JM Huber, I must deny CNA's motion for summary judgment on the breach of the implied covenant of good faith and fair dealing.

### C. CNA's Remaining Claims

#### 1. Unjust Enrichment

Summary judgment will be granted to JM Huber on CNA's claim alleging unjust enrichment.

Under New Jersey law, to prove a claim for unjust enrichment, "a party must demonstrate that the opposing party 'received a benefit and that retention of that benefit without payment would be unjust.'" *Thieme v. Aucoin–Thieme*, 227 N.J. 269, 151 A.3d 545, 557 (2016) (quoting *Iliadis v. Wal–Mart*

*Stores, Inc.*, 191 N.J. 88, 110, 922 A.2d 710 (2007). This doctrine of quasi-contract also requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights. *Id.* (quoting *Iliadis*, 191 N.J. at 110, 922 A.2d 710); *see also Ebner v. Statebridge Co.*, LLC, No. 16-8855, 2017 WL 2495408, at *9 (D.N.J. June 9, 2017) (noting that restitution for unjust enrichment is an equitable remedy and only available when there is no express contract providing for remuneration).

An unjust enrichment claim must fail, however, where an express contract governs the relationship between the parties on the same subject matter. *See In re Phillips/Magnavox Television Litig.*, No. CIV.A. 09-3072 PGS, 2010 WL 3522787, at *10 (D.N.J. Sept. 1, 2010); *Moser v. Milner Hotels, Inc.*, 6 N.J. 278, 280 (1951) ("It is a well settled rule that an express contract excludes an implied one. An implied contract cannot exist when there is an existing express contract about the identical subject." (internal quotation marks omitted)). Here, CNA claims JM Huber was unjustly enriched by receiving the benefit of insurance coverage for asbestos losses without paying the associated retrospective premiums called for in the policies at issue. (CNA Reply at 13.) This is a clear duplication of CNA's breach of contract claim. Though CNA contends that it pleaded unjust enrichment as an alternative to its primary breach of contract claim, CNA explicitly states that its unjust enrichment claim is based on JM Huber "evad[ing] its payment obligation." (*Id.*) Whether that obligation exists is a contractual question. The insurance policies at issue and/or the parties' subsequent agreement set forth in the Nagy-Cappello Letter govern the relationship between the parties as it pertains to JM Huber's payment obligations. I have permitted alternative or inconsistent pleading of such claims at the motion to dismiss stage, but this action has been pending for many years, and is on summary judgment. No divergence between the contract breach and unjust enrichment theories has emerged.

I will therefore award summary judgment to JM Huber on CNA's unjust enrichment claim.

## 2. Account Stated

Summary judgment will also be granted to JM Huber on CNA's account stated claim.

"To establish an account stated, respondent must show that a balance was struck in such circumstances as to import a promise of payment on the one side and acceptance on the other." *United States v. A. S. Kreider Co.*, 313 U.S. 443, 448 (1941). "It is not essential that an account stated be in any particular form. Any evidence indicating an admission by the debtor to the creditor of a stated indebtedness claimed by the latter will furnish ground for implying a promise to pay. Evidence of assent to an account stated may consist of express statements or inferences from conduct." *Harris v. Merlino*, 137 N.J. 717, 720 (1948) (citing 6 Williston on Contracts, sec. 1863). In short, an account stated cause of action is best adapted to relatively straightforward facts, *e.g.,* an unpaid bill for goods concededly delivered.

Here, CNA insists that because JM Huber has not presented any evidence or expert opinion to show that CNA failed to calculate properly the retrospective premiums that appear on its invoices, JM Huber has implied a promise to pay. (Def. St. ¶ 87; CNA Opp. at 13.) The record does not reflect a single instance since 2012 (when Lou Cappello, acting on JM Huber's behalf, first sought an explanation for the charges on CNA's 2012 invoice) in which JM Huber conceded liability for any portion of the amount CNA says it owes. Even when discussing the premiums it owes for pollution claims and workers' compensation claims, JM Huber has continually implied that it will "put[] Plaintiffs to their proofs" because it believed a number of the pollution premiums were untimely, and because it is unable to verify how much it owes in workers' compensation premiums. (Joint Status Letter at 3.) Given that the record reflects no express or implied promise by JM Huber to pay any portion of the debt it allegedly owes, CNA's account stated claim must be dismissed.

I will therefore award summary judgment to JM Huber on CNA's account stated claim. The amounts owing, whatever they are, will be determined in connection with the claims that remain in the case.

**IV.    CONCLUSION**

For the reasons set forth above, CNA's motion for summary judgment is **DENIED**, and JM Huber's motion for summary judgment is **GRANTED in part and DENIED in part**.

An appropriate order follows.

Dated: November 30, 2022

/s/ Kevin McNulty

_____
**Hon. Kevin McNulty**
**United States District Judge**